**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**
**JOHNSTOWN DIVISION**

| | |
|---|---|
| LINDSEY LABELLA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>THE PROCTER & GAMBLE COMPANY,<br><br>Defendant. | Case No.  3:21-cv-216<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Lindsey LaBella ("Plaintiff"), individually and on behalf of all others similarly situated, respectfully offers the following for her Complaint against The Procter & Gamble Company ("P&G" or "Defendant") and alleges upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## NATURE OF THE ACTION

1. Plaintiff brings this class action lawsuit on behalf of herself and all similarly situated consumers ("Class Members") who purchased for normal household use P&G antiperspirant and/or deodorant products that are defective because they contain benzene, and which were formulated, designed, manufactured, marketed, advertised, distributed, and sold by P&G (the "Products"). These products include Secret-branded spray antiperspirants (including but not limited to Powder Fresh or Secret Cool Light & Airy Smooth Feel spray antiperspirants ("Secret Products")), and Old Spice-branded spray deodorants and antiperspirants (including Pure Sport antiperspirant, Old Spice Below Deck Powder spray deodorant, or Old Spice

Sweat Defense, Stronger Swagger antiperspirant ("Old Spice Products")) (collectively, the "Products"). Each of the Products is manufactured, distributed, and sold by P&G to consumers across the United States both in retail establishments and online, including in Pennsylvania where Plaintiff resides.

2.  The Products are defective because each contains significant amounts of the chemical benzene, a known human carcinogen that offers no therapeutic deodorant or antiperspirant benefit; yet despite the presence of benzene, P&G represents that the Products are safe and effective for their intended use.

3.  Benzene is known to cause cancer in humans. Long-term exposure to this chemical causes harmful effects on the bone marrow, a decrease in red blood cells leading to anemia, and excessive bleeding that can affect the immune system, leading to an increased chance of infection.

4.  The FDA instructs that there is no safe level of benzene, and thus it "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity."[1]

5.  FDA guidance provides that "if [benzene's] use is unavoidable in order to produce a drug product with a significant therapeutic advance, then [its] levels should be restricted" to 2 parts per million ("ppm").[2]

6.  Other manufacturers formulate, produce, and sell non-defective spray deodorants and antiperspirants with formulations that do not include the use of benzene, evidence that its use in P&G's Products is demonstrably avoidable. Feasible alternative formulations, designs,

---

[1] FDA, Q3C–2017 Tables and List Guidance for Industry (dated June 2017, available at: https://www.fda.gov/media/71737/download, last viewed on December 13, 2021).
[2] *Id.*

and materials are currently available and were available to Defendant at the time the Products were formulated, designed, and manufactured.

7. At the time of their purchases, P&G did not notify Plaintiff and similarly situated consumers of the Products' benzene contamination through its product labels, the ingredients list, other packaging, advertising, or in any other manner, in violation of state and federal law.

8. Over the course of several decades, P&G has gained the trust of consumers, who reasonably believed that its products, including the defective Products at issue, are made with quality materials, and can be used safely as intended; yet these Products were not safe. Independent testing of the Products shows them to be adulterated with benzene.

9. Only recently, on or about November 23, 2021, has P&G acknowledged that certain of its Products include the carcinogenic benzene and pulled certain lot numbers from the market. However, in its press release, on its website, and even on its consumer assistance phone recordings—and directly contrary to the guidance of the FDA and the CDC (discussed further below)— P&G minimizes the danger of benzene to humans. For example, on both its Secret and Old Spice Product Recall pages, it states in part:

> Benzene is a chemical compound released to the environment by both natural and industrial sources. It is classified as a human carcinogen, a substance that could potentially cause cancer depending on the level and extent of exposure. Benzene is ubiquitous in the environment. Humans around the world have daily exposures to it indoors and outdoors from multiple sources. Benzene can be absorbed, to varying degrees, by inhalation, through the skin, and orally. Based on exposure modeling and the cancer risk assessments published under the Environmental Protection Agency (EPA) (IRIS database), *daily exposure to benzene in the recalled products at the levels detected in our testing would not be expected to cause adverse health consequences.*[3]

---

[3] https://secret.com/en-us/aerosol-recall#top; https://oldspice.com/en-us/aerosolrecall (last viewed December 16, 2021).

10. In addition, on P&G's customer service recording about the recall, it even claims "*benzene is not an ingredient in any of our products*"[4] although Valisure found up to 17.7 ppm (almost 9 times the 2 ppm ceiling set by the FDA) in its Products.[5] P&G's dismissive propaganda about the recall and its excessively defensive stance to this recall undercuts the FDA and CDC's efforts to protect the health of people in the United States.

11. Because Plaintiff and Class Members purchased worthless and, worse, they purchased and used Products that are dangerous to their health, they have suffered losses. Plaintiff seeks damages and equitable remedies on behalf of herself and the proposed Classes, defined herein.

## PARTIES

**A. Plaintiff**

12. Plaintiff Lindsey LaBella is a resident and citizen of Bellwood, Blair County, Pennsylvania who purchased and used Secret Antiperspirant Products within the relevant time period.

**B. Defendant**

13. Defendant The Procter & Gamble Company is multinational company that has been incorporated under the laws of the State of Ohio since 1905. Its corporate headquarters are located at 6280 Center Hill Ave Cincinnati, OH. P&G manufactures, distributes, markets and/or sells personal care products nationwide, including the Secret Antiperspirants and Old Spice Deodorants at issue in this matter. P&G may be served via its registered agent at: CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus Ohio 43219.

---

[4] P&G Customer Service recording at 888-339-7689 (last heard on December 16, 2021).
[5] https://www.valisure.com/wp-content/uploads/Valisure-FDA-Citizen-Petition-on-Body-Spray-v4.0-3.pdf at p. 12 (last viewed December 16, 2021).

14. Upon information and belief, the planning and execution of the advertising, marketing, labeling, packaging, testing, and/or corporate operations concerning the Products and the claims alleged herein was primarily carried out at P&G's headquarters and facilities within Ohio.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more putative Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and (iii) there is minimal diversity because Plaintiff and Defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

16. This Court has personal jurisdiction over Defendant because they have substantial aggregate contacts with this District, including engaging in conduct in this District that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and because they purposely availed themselves of the laws of the United States and the Commonwealth of Pennsylvania, including in this District, and/or has caused its products to be disseminated in this District.

17. Venue in this district is proper in this Court pursuant to 28 U.S.C. §1391 because Plaintiff LaBella resides in this District, a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District, P&G transacts business in this District, and has intentionally availed itself of the laws and markets within this District.

**FACTUAL ALLEGATIONS**

18. P&G is well-established for its personal care and hygiene products, including the Secret Antiperspirant and Old Spice Antiperspirant and Deodorant Products at issue here. On its website, it advertises its products as "Iconic brands you can trust."[6]

19. P&G built its strong reputation and consumer trust for more than a century by manufacturing and selling brands that have typically been of high quality, and as a result, P&G earns billions annually in revenue.

**The Products**

20. The Secret and Old Spice Products at issue in this lawsuit are body spray deodorants and antiperspirants used by consumers, including Plaintiff and similarly situated consumers, to control sweat and body odor. Deodorant is applied to the body to prevent or mask the odor of perspiration. Antiperspirants, a subgroup of deodorants, prevent sweat glands from producing sweat.

21. The U.S. Food and Drug Administration ("FDA") classifies the Products as cosmetics and regulates deodorants. In addition, the FDA classifies and regulates antiperspirants as drugs. The P&G Products fall under FDA regulations.

22. On November 3, 2021, Valisure, an analytical pharmacy and consumer protection organization, petitioned the FDA to address the dangerous levels of benzene in deodorants and antiperspirants based upon rigorous testing the organization had conducted on a number

---

[6] https://us.pg.com/brands/ (last viewed December 14, 2021).

of spray deodorant and antiperspirant products.[7] The next day, Valisure released the results of these tests.[8]

23.  In its laboratory testing, Valisure found average concentrations of benzene above the FDA concentration limit of 2 ppm in 16 spray deodorants. Nearly one third of those sprays were P&G Products, sold under the Secret and Old Spice brands, with the P&G Products having some of the highest benzene concentrations in Valisure's testing.

24.  P&G's Secret Antiperspirants had some of the highest benzene concentrations of Valisure's testing. For example, P&G's Secret Powder Fresh 24 HR Aerosol antiperspirant with Product Code 037000711087 had a benzene concentration of 16.2 ppm, more than 8 times the FDA concentration limit.[9]  Likewise, the tests done on Secret Powder Fresh 24 HR Aerosol with Product Code 037000711094 show a benzene concentration of 12.5 ppm.[10] Testing of P&G's Secret Cool Light & Airy Smooth Feel Dry Spray, 48 Hour Freshness, Rose antiperspirant resulted in a finding of 4.85 ppm benzene.[11] Each of these levels is far above the FDA allowed benzene concentration limit of 2 ppm.

25.  Similarly, Valisure testing found excessively high benzene concentrations in P&G's Old Spice Products. Its Old Spice Pure Sport antiperspirant had a benzene concentration of 17.7 ppm,[12] and its Old Spice Below Deck Powder Spray deodorant had a 5.22 ppm benzene

---

[7] https://www.valisure.com/wp-content/uploads/Valisure-FDA-Citizen-Petition-on-Body-Spray-v4.0-3.pdf (last visited December 14, 2021).
[8] https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-body-spray-products-3/ (last visited December 14, 2021).
[9] https://www.valisure.com/wp-content/uploads/Valisure-FDA-Citizen-Petition-on-Body-Spray-v4.0-1.pdf at p. 12, Table 2 (last visited December 14, 2021).
[10] Id.
[11] Id. at p. 13.
[12] Id. at p. 12.

concentration.[13] The Old Spice Sweat Defense, Stronger Swagger, Dry Spray antiperspirant was found to have a 4.54 ppm concentration.[14] Again, each of these levels is far above the FDA concentration limit of 2 ppm.

**The Risks of Excessive Benzene in the Products**

26. Benzene is used primarily as a solvent in the chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals, and in gasoline. The major United States source of benzene is petroleum. The health hazards of benzene have been recognized for over one hundred years.

27. According to the National Toxicology Program ("NTP"), benzene is "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans."[15] Benzene has also been "found to be carcinogenic to humans" by the International Agency for Research on Cancer ("IARC").[16] Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[17] As noted by the IARC:

> In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on *sufficient evidence* of carcinogenicity in humans, *sufficient evidence* of carcinogenicity in experimental animals, and *strong* mechanistic evidence. . . . In particular, benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative damage to DNA; is genotoxic; alters DNA repair or causes genomic

---

[13] *Id.*
[14] *Id.* at p. 13.
[15] *Benzene,* Report on Carcinogens, Fourteenth Edition, DEPT. OF HEALTH AND HUMAN SERVICES (Nov. 3, 2016), https://ntp.niehs.nih.gov/ntp/roc/content/profiles/benzene.pdf. (emphasis in original).
[16] *Benzene,* IARC MONOGRAPHS ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS, Volume 120 (2018),
https://publications.iarc.fr/_publications/media/download/6043/20a78ade14e86cf076c3981a9a09 4f45da6d27cc.pdf.
[17] *Id.*

instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.[18]

28. The carcinogenic properties of benzene are well documented, as noted be the Centers for Disease Control and Prevention ("CDC").[19]

29. The U.S. Department of Health and Human Services ("DHHS") has determined that benzene causes cancer in humans. Long-term exposure to high levels of benzene can cause leukemia, cancer of the blood-forming organs.

30. Long-term exposure to benzene additionally causes harmful effects on the bone marrow and can cause a decrease in red blood cells, leading to anemia. It can also cause excessive bleeding and can affect the immune system, increasing the chance for infection.

31. Due to these significant health risks, the World Health Organization and the International Agency for Research on Cancer classify benzene as a Group 1 compound that is "carcinogenic to humans."[20]

32. The FDA regulates deodorants to ensure they meet safety and effectiveness standards. The FDA also regulates antiperspirants, including the Products at issue here, as over-the-counter ("OTC") drugs rather than as cosmetics. As an FDA-regulated product, antiperspirants must pass certain tests before they are sold.

33. The FDA classifies Benzene as a Class 1 compound. According to FDA guidance: "Solvents in Class 1 should not be employed in the manufacture of drug substances, excipients, and

---

[18] *Id.* (emphasis in original).
[19] See CDC, Facts About Benzene (2018),
https://emergency.cdc.gov/agent/benzene/basics/facts.asp (last visited December 14, 2021).
[20] https://www.who.int/water_sanitation_health/dwq/chemicals/benzenesum.pdf (last visited December 14, 2021).

drug products, because of their unacceptable toxicity or their deleterious environmental effect."[21]

**P&G's Represents that the Products Are Safe and Can Be Trusted**

34. On its website, P&G represents that the Products are safe. Describing the Secret Powder Fresh antiperspirant that shown to have a benzene concentration 8 times greater than the FDA limit, P&G assures consumers that "[i]t's the original, the one you have known and trusted for years . . . . Be confident with Secret Original."[22] Although Secret Powder Fresh, P&G does not list benzene among the active or inactive ingredients for Secret Powder Fresh aerosol antiperspirant[23] anywhere on its website, and nothing on the Product label (shown below) warns that the Product contains benzene.



35. The marketing representations for P&G's Secret Dry Spray Antiperspirant are similar. Although Valisure testing found benzene concentration of 3.72 ppm in Secret Dry Spray,

---

[21] https://www.fda.gov/media/71737/download (last visited December 14, 2021).
[22] https://secret.com/en-us/shop/original-aerosol
[23] https://smartlabel.pg.com/00037000711087.html

benzene is never listed in its active or inactive ingredients on the Product's label (shown below[24]) or P&G's website.



36. P&G's Old Spice Products to mention, however, that Old Spice Pure Sport antiperspirant has a benzene concentration level of 17.7, more than 8 times greater than the FDA limit. But despite this dangerously high level of a known carcinogen the Product label (shown below[25]) fails to disclosure that it contains benzene.

---

[24] https://www.walmart.com/ip/Secret-Dry-Spray-Antiperspirant-Deodorant-Rose-Invisible-Spray-3-8-oz/756378262 (last viewed November 20, 2021).

[25] https://www.walmart.com/ip/Old-Spice-Pure-Sport-Aerosol-Antiperspirant-and-Deodorant-6-Oz/23750273 (last viewed November 20, 2021).



37.     The representations on P&G's Old Spice Below Deck Powder Spray Fresh Air product label

proclaim that the Product is "<Free of talc and aluminum>" but fail to mention its benzene

concentration level of 5.22 ppm is more than twice the FDA limit (shown below[26]).



38.     For each of P&G's Secret and Old Spice Products that were tested by Valisure and contained

greater than the FDA's benzene limit of 2.00 ppm, none of them include label warnings, none

---

[26] https://www.walmart.com/ip/Old-Spice-Below-Deck-Powder-Spray-Fresh-Air-4-9-Oz/988057692 (last viewed November 20, 2021).

include benzene on their ingredient lists, and P&Gs website does not disclose the benzene concentrations.

**P&G's Misrepresentations and Omissions are Actionable**

39. Defendant's failure to control for benzene contamination and continued sale of its adulterated products constitutes actionable fraud.

40. Plaintiff and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of benzene, and Defendant has failed to warn consumers of this fact. Such illegally sold products are worthless and have no value. *See Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *see also In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, MDL No. 2875, 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021) ("This Court finds that contaminated drugs are economically worthless at the point of sale by virtue of the dangerousness caused by their contamination, regardless of whether the sold VCDs actually achieved the medical purpose of lowering blood pressure. Put differently, contaminated drugs, even if medically efficacious for their purpose, cannot create a benefit of the bargain because the contaminants, and their dangerous effects, were never bargained for.").

41. Plaintiff and Class members bargained for a perspiration product free of contaminants and dangerous substances and were deprived the basis of their bargain when Defendant sold them a product containing the dangerous substance benzene, which rendered the Products unmerchantable and unfit for use.

42. As the Products expose consumers to benzene well above the legal limit, the Products are not fit for use by humans. Plaintiff is further entitled to damages for the injury sustained in being exposed to high levels of acutely toxic benzene, damages related to Defendant's conduct, and injunctive relief.

43. Plaintiff has standing to represent members of the putative Classes because there is sufficient similarity between the specific products purchased by the Plaintiff and the other Products not purchased by the Plaintiff. Specifically, each and every one of P&G's Products (i) are marketed in substantially the same way – as "Deodorant" or "Antiperspirant" – and (ii) fail to include labeling indicating to consumers that the Products may contain benzene as an active or inactive ingredient. Accordingly, the misleading effect of all of the Products' labels are substantially the same.

44. Plaintiff seeks to recover damages because the Products are adulterated, defective, worthless, and unfit for human use due to the presence of benzene, a carcinogenic and toxic chemical impurity.

45. Plaintiff and the putative Class suffered economic damages due to Defendant's misconduct (as set forth below), and they seek injunctive relief and restitution for the full purchase price of the Product(s) they purchased. Plaintiff alleges the following based upon personal knowledge as well as investigation by counsel, and as to all other matters, upon information and belief. Plaintiff further believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

46. Plaintiff brings this action on behalf of themselves and the Classes for equitable relief and to recover damages and restitution for: violation of the consumer protection statutes invoked herein; fraudulent concealment; and unjust enrichment.

**Defendant's Marketing and Sale of the Products Violates Federal Law**

47. Section 5(a) of the Federal Trade Commission ("FTC") Act, 15 U.S.C. §45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

48. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

49. Section 12 of the FTC Act, 15 U.S.C. §52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics. For the purposes of Section 12 of the FTC Act, 15 U.S.C. §52, the Products are "drugs" and "cosmetics as defined in Section 15 (c) and (e) of the FTC Act, 15 U.S.C. §§ 55(c) and (e). Under these provisions, companies must have a reasonable basis for making objective product claims.

50. The Federal Food, Drug, and Cosmetic Act ("FD&C Act") prohibits "The introduction or delivery for introduction into interstate commerce of any food, drug, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a).

51. P&G has represented that the ingredients in its Products are safe, effective and are not adulterated with benzene. However, these representations are false, deceptive, and misleading as the Products actually contain dangerous levels of benzene. The making of such misrepresentations by P&G constitutes a deceptive act or practice and the making of false advertisements in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§45(a) and 52(b).

52. As alleged herein, P&G has violated the FD&C Act and consumer protection statutes.

53. Plaintiff and the Classes have suffered injury in fact and have lost money as a result of P&G's unlawful sale of the Products. Indeed, no reasonable consumer, including Plaintiff, would have purchased the Products had they known they were adulterated and/or misbranded.

54. P&G engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful conduct stemming from its omissions surrounding benzene contamination affecting the Products.

55. Plaintiff and the Classes have suffered injury in fact and have lost money as a result of P&G's unlawful sale of the Products. Indeed, no reasonable consumer, including Plaintiff, would have purchased the Products had they known of the material omissions of material facts regarding the presence of Benzene. Accordingly, Plaintiff and the Classes suffered injury in fact and lost money as a result of P&G's misleading representations and omissions and did not receive the benefit-of-the- bargain.

56. Plaintiff and the Class's injury is underscored by the fact that numerous other products offering the same therapeutic benefit at comparable prices exist that are not prone to benzene contamination.

57. Plaintiff and the Class may be harmed again in the future because they want to purchase the Products in the future; however, without injunctive relief Plaintiff would not be able to know or trust that P&G will truthfully and legally label the Products and would be likely to be misled again.

## PLAINTIFF'S FACTUAL ALLEGATIONS

58. Plaintiff Lindsey LaBella purchased for her personal use Secret Powder Fresh 24-Hour Aerosol antiperspirant bearing UPC Code 037000711087 (Lot Number 11721458SG) and Secret Cool Light & Airy Smooth Feel Dry Spray 48 Hour Freshness antiperspirant bearing UPC Code 037000798842 (Lot Number 11091458SN) near her residence in Bellwood, Pennsylvania.

59. Nowhere on the Products' packaging did P&G disclose that the Products contain benzene at the time of purchase.

60. If Plaintiff LaBella had been aware of the existence of benzene in the Products, she would not have purchased the Products or would have paid significantly less.

61. As a result of P&G's actions, Plaintiff LaBella has incurred damages, including economic damages.

62. If the Secret Products were reformulated to be safe and without benzene, Plaintiff LaBella would choose to purchase the Products in the future.

## CLASS ACTION ALLEGATIONS

63. Plaintiff brings this case as a class action pursuant to Federal Rule of Civil Procedure 23 on her own behalf and as the Class representatives on behalf of the following:

> **Nationwide Class:** All persons within the United States who purchased the Products within the applicable statute of limitations.

> **Pennsylvania Subclass:** All persons within the Commonwealth of Pennsylvania who purchased the Products within the applicable statute of limitations.

64. The Nationwide Class and Pennsylvania Subclass shall collectively be referred to herein as the "Classes."

65. Plaintiff reserves the right to amend the Class definitions if further investigation and discovery indicate that the Class definitions should be narrowed, expanded, or otherwise modified.

66. Excluded from the Classes are governmental entities, P&G, its officers, directors, affiliates, legal representatives, and employees.

67. This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

68. **Numerosity** – Federal Rule of Civil Procedure 23(a)(1). This Class numbers at least in the thousands of persons. As a result, joinder of all Class members in a single action is impracticable. Class members may be informed of the pendency of this class action through a variety of means, including, but not limited to, direct mail, email, published notice, and website posting.

69.  **Existence and Predominance of Common Questions of Law and Fact** – Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).  There are questions of fact and law common to the Classes that predominate over any question affecting only individual members.  Those questions, each of which may also be certified under Rule 23(c)(4), include without limitation:

   a.  whether P&G's advertising, merchandising, and promotional materials directed to Plaintiff were deceptive regarding the risks posed by benzene concentrations in P&G's Products;

   b.  whether P&G made representations regarding the safety of the Products;

   c.  whether P&G omitted material information regarding the safety of the Products;

   d.  whether P&G's Products were merchantable;

   e.  whether P&G violated the consumer protection statutes invoked herein;

   f.  whether P&G's conduct alleged herein was fraudulent; and

   g.  whether P&G was unjustly enriched by sales of the Products.

70.  The questions set forth above predominate over any questions affecting only individual persons concerning sales of P&G's Products throughout the United States and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of Plaintiff's claims.

71.  **Typicality** – Federal Rule of Civil Procedure 23(a)(3).  Plaintiff's claims are typical of those of the Class in that the Class members uniformly purchased P&G's Products and were subjected to P&G's uniform merchandising materials and representations at the time of purchase.

72. **Superiority** – Federal Rule of Civil Procedure 23(b)(3). A class action is the appropriate method for the fair and efficient adjudication of this controversy. The presentation of separate actions by individual Class members could create a risk of inconsistent adjudications, establish incompatible standards of conduct for P&G, and/or substantially impair or impede the ability of Class members to protect their interests. In addition, it would be impracticable and undesirable for each member of the Class who suffered an economic loss to bring a separate action. The maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all Class members.

73. **Adequacy** – Federal Rule of Civil Procedure 23(a)(4). Plaintiff is an adequate representative of the Classes because she is a member of the Classes and her interests do not conflict with the interests of the Classes that she seeks to represent. The interests of the members of the Classes will be fairly and adequately protected by Plaintiff and her undersigned counsel. Counsel is experienced in the litigation of civil matters, including the prosecution of consumer protection class action cases.

74. **Insufficiency of Separate Actions** – Federal Rule of Civil Procedure 23(b)(1). Absent a representative class action, members of the Classes would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing

incompatible standards of conduct for P&G. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

75. **Declaratory and Injunctive Relief** – Federal Rule of Civil Procedure 23(b)(2). P&G has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole. In particular, Plaintiff seeks to certify a Class to enjoin P&G from selling or otherwise distributing the Products as labeled until such time that Defendant can demonstrate to the Court's satisfaction that the Products confer the advertised benefits and are otherwise safe to use as intended.

76. Additionally, the Classes may be certified under Rule 23(b)(1) and/or (b)(2) because:

a. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for the P&G;

b. The prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c. P&G has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Classes as a whole.

## CAUSES OF ACTION

### COUNT I

**Breach of Express Warranty**
**(On Behalf of the National Class and, alternatively, the Subclass)**

77. Plaintiff repeats and re-alleges the allegations above as if set forth herein.

78. Plaintiff, and each member of the National Class, formed a contract with Defendant at the time Plaintiff and each member of the National Class purchased the Products.

79. The terms of the contract include the promises and affirmations of fact made by Defendant on the Products' packaging and through marketing and advertising, as described above.

80. This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and the members of the National Class and Defendant.

81. As set forth above, Defendant purports through its advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for its intended use.

82. Plaintiff and the members of the National Class performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

83. Defendant breached express warranties about the Products and their qualities because Defendant's Product contained the harmful chemical benzene at the time of purchase and the Products do not conform to Defendant's affirmations and promises described above.

84. Plaintiff and each of the members of the National Class would not have purchased the Products had they known the true nature of the harmful chemicals in the Product.

85. As a result of Defendant's breach of warranty, Plaintiff and each Class Member suffered and continue to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## COUNT II

**Breach of Implied Warranty**
**(On Behalf of the National Class and, alternatively, the Subclass)**

86. Plaintiff repeats and re-alleges the allegations above as if set forth herein.

87. P&G is a merchant and was at all relevant times involved in the manufacturing, distributing, warranting, and/or selling of the Products.

88. The Products are "goods" under the relevant laws, and P&G knew or had reason to know of the specific use for which the Products, as goods, were purchased.

89. P&G entered into agreements with retailers to sell its Products to be used by Plaintiff and Class Members for personal use.

90. The implied warranty of merchantability included with the sale of each Product means that P&G guaranteed that the Products would be fit for the ordinary purposes for which deodorants and antiperspirants are used and sold, and were not otherwise injurious to consumers. The implied warranty of merchantability is part of the basis for the benefit of the bargain between P&G, and Plaintiff and the Class Members.

91. P&G breached the implied warranty of merchantability because the Products are not fit for their ordinary purpose of providing reasonably reliable and safe use for preventing or masking body odor because the Products contain benzene, a known and dangerous carcinogen. Therefore, the Products are not fit for their particular purpose of safely preventing or masking body odor.

92. P&G's warranty expressly applies to the purchaser of the Products, creating privity between P&G and Plaintiff and Class Members.

93. However, privity is not required because Plaintiff and Class Members are the intended beneficiaries of P&G's warranties and its sale through retailers. P&G's retailers were not

intended to be the ultimate consumers of the Products and have no rights under the warranty agreements. P&G's warranties were designed for and intended to benefit the consumer only, including Plaintiff and Class Members.

94. P&G has been provided sufficient notice of its breaches of implied warranties associated with the Products. P&G was put on constructive notice of its breach through its review of consumer complaints and other reports, including the Valisure testing report discussed throughout this complaint, and upon information and belief through its own product testing.

95. Had Plaintiff, Class Members, and the consuming public known that the Products were contaminated with benzene, they would not have purchased the Products or would have paid less for them.

96. As a direct and proximate result of the foregoing, Plaintiff and Class Members suffered and continue to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## COUNT III

### Fraudulent Concealment
### (On Behalf of the Nationwide Class, or
### alternatively, on behalf of the Subclass)

97. Plaintiff repeats and re-alleges the allegations above as if set forth herein.

98. Plaintiff brings this claim against Defendant, on behalf of herself and the other members of the Nationwide Class, and, alternatively, the State subclass pled in Paragraph 63 (the "Classes").

99. Defendant had a duty to disclose material facts to Plaintiff and the Classes given their relationship as contracting parties and intended users of the Products. Defendant also had a duty to disclose material facts to Plaintiff and the Classes, namely that it was in fact

23

manufacturing, distributing, and selling harmful products unfit for human use, because Defendant had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

100. Defendant possessed knowledge of these material facts. Since at least mid-2020, numerous recalls put Defendant on notice that adulterated and misbranded products were being investigated for contamination with carcinogens, including benzene. Further, benzene is not unavoidable in the manufacture of deodorants.

101. During this time, Plaintiff, and members of the Classes, were using the Products without knowing they contained dangerous levels of benzene.

102. Defendant failed to discharge its duty to disclose these materials facts.

103. In so failing to disclose these material facts to Plaintiff and the Classes, Defendant intended to hide from Plaintiff and the Classes that they were purchasing and consuming the Products with harmful defects that was unfit for human use, and thus acted with scienter and/or an intent to defraud.

104. Plaintiff and the Classes reasonably relied on Defendant's failure to disclose insofar as they would not have purchased the defective Products manufactured and sold by Defendant had they known they contained unsafe levels of benzene.

105. As a direct and proximate cause of Defendant's fraudulent concealment, Plaintiff, and the Classes, suffered damages in the amount of monies paid for the defective Products.

106. As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

## COUNT IV

### Unjust Enrichment
### (On Behalf of the Nationwide Class)

107.  Plaintiff incorporates the allegations set forth in the preceding paragraphs as though set forth fully herein.

108.  Plaintiff, and the other members of the Nationwide Class, conferred benefits on Defendant in the form of monies paid to purchase Defendant's defective and worthless Products.

109.  Defendant voluntarily accepted and retained this benefit.

110.  Because this benefit was obtained unlawfully, namely by selling and accepting compensation for products unfit for human use, it would be unjust and inequitable for Defendant to retain the benefit without paying the value thereof.

111.  Defendant received benefits in the form of revenues from purchases of the Products to the detriment of Plaintiff, and the other members of the Nationwide Class, because Plaintiff, and members of the Nationwide Class, purchased mislabeled products that were not what they bargained for and were not safe and effective, as claimed.

112.  Defendant has been unjustly enriched in retaining the revenues derived from the purchases of the Products by Plaintiff and the other members of the Nationwide Class. Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Products was misleading to consumers, which caused injuries to Plaintiff, and members of the Nationwide Class, because they would have not purchased the Products had they known the true facts.

113.  Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and members of the Nationwide Class is unjust and inequitable, Defendant must pay

restitution to Plaintiff and members of the Nationwide Class for its unjust enrichment, as ordered by the Court.

## COUNT V

**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law**
**(On Behalf of the Pennsylvania Subclass)**

114. Plaintiff LaBella incorporates the allegations set forth in the preceding paragraphs as though set forth fully herein.

115. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL"), 73 Pa. Cons. Stat. §§201-1, *et seq.*, prohibits the use of unfair or deceptive acts or practices in the conduct of trade or commerce. The Pennsylvania CPL is to be liberally construed to effectuate its purpose.

116. Plaintiff LaBella, and other members of the Pennsylvania Subclass, as purchasers of the Products, are consumers within the meaning of the Pennsylvania CPL given that P&G's business activities involve trade or commerce, are addressed to the market generally, and otherwise implicate consumer protection concerns.

117. P&G's conduct in misrepresenting the benefits of its Products and/or omitting material information from the Products' labels constitutes the act, use and employment of deception, fraud, false pretenses, false promises, misrepresentation, and unfair practices in the conduct of P&G's trade or commerce.

118. P&G also knowingly concealed, suppressed, and consciously omitted material facts to Plaintiff, and other members of the Pennsylvania Subclass, knowing that consumers would rely on the advertisements, packaging, and P&G's uniform representations to purchase the Products.

119. Once the defect in the Products and its tendency to cause cancer in humans became apparent to P&G, consumers (Plaintiff LaBella and other members of the putative Pennsylvania Subclass) were entitled to disclosure of that fact because a significant risk of P&G's Products potentially being adulterated with and containing harmful levels of benzene, a human carcinogen, would be a material fact in a consumer's decision-making process, and, without P&G' disclosure, consumers would not necessarily know that there is such a risk.

120. P&G intended that Plaintiff LaBella, and the Pennsylvania Subclass, would rely on the continued deception by purchasing the Products, unaware of the material facts and omissions described above. P&G knew that its customers would continue to rely on its representations that the ingredients in its Products were safe, effective and were not adulterated with benzene, and knew that consumers would continue to rely upon its silence as to any known risk of the presence of a carcinogenic and toxic chemical impurity, as evidence that the Products were safe. This conduct constitutes consumer fraud within the meaning of the Pennsylvania CPL.

121. P&G's material non-disclosure set forth above constitutes an unconscionable commercial practice, deception, fraud, false promise, misrepresentation and/or omission of material facts as to the nature of the goods, in violation of the Pennsylvania CPL.

122. Plaintiff LaBella and the other members of the Pennsylvania Subclass suffered damages as a proximate result of the unfair acts or practices of P&G alleged herein. P&G's misrepresentations and/or omissions of material fact were done knowingly, intentionally, willfully or with reckless disregard for the consequences of its actions.

123. Plaintiff LaBella, and other members of the Pennsylvania Subclass, would not have purchased the Products but for the promised benefits and concealment of any risk of harm because the Products as sold had no intrinsic value to them.

124. P&G knowingly accepted the benefits of its deception and improper conduct in the form of profits from the increased sale of the Products.

125. As a proximate result of the above-described violations of the Pennsylvania CPL, Plaintiff LaBella, and other members of the Pennsylvania Subclass: (a) purchased and used the Products when they would not otherwise have done so; (b) suffered economic losses consisting of the cost of purchasing the Products; and (c) suffered and/or will suffer additional economic losses by purchasing the Products.

126. P&G's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

127. Plaintiff LaBella also seeks to enjoin P&G's ongoing deceptive practices relating to its claims on the Products' labels and advertising.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Classes alleged herein, respectfully request that the Court enter judgment in her favor and against Defendant as follows:

A. For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representatives for the Classes and Plaintiff's attorneys as Class Counsel;

B. For an order declaring the Defendant's conduct violates the causes of action referenced herein;

C. For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

D.     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.     For prejudgment interest on all amounts awarded;

F.     For an order of restitution and all other forms of equitable monetary relief;

G.     For injunctive relief as pleaded or as the Court may deem proper; and

H.     For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all claims in this Complaint and of any and all issues in this action so triable as of right.

Dated: December 17, 2021                  Respectfully Submitted,

By:  */s/ Gary F. Lynch*

Gary F. Lynch
Kelly K. Iverson
**LYNCH CARPENTER LLP**
1133 Penn Avenue
Floor 5
Pittsburgh, PA 15222
Telephone: (412) 322-9243
gary@lcllp.com
kelly@lcllp.com

Katrina Carroll
**LYNCH CARPENTER LLP**
111 W. Washington Street
Suite 1250
Chicago, IL 60602
Telephone: (312) 750-1265
katrina@lcllp.com

Jonathan M. Jagher
**FREED KANNER LONDON
   & MILLEN LLC**

29

923 Fayette Street
Conshohocken, PA  19428
Telephone: (610) 234-6487
jjagher@fklmlaw.com

Jonathan Shub
**SHUB LAW FIRM LLC**
134 Kings Highway E., 2nd Floor
Haddonfield, NJ 08033
Telephone: (856) 772-7200
jshub@shublawyers.com

*Attorneys for Plaintiff and the Classes*